## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF NEW HAMPSHIRE

Randolph Chambers

     v.                                    Civil No. 11-cv-355-PB

Dr. John Eppolito[1]

## REPORT AND RECOMMENDATION

Before the court are Randolph Chambers' complaint (doc. no.
1), addenda to the complaint (doc. nos. 8 and 15[2]), memorandum in
support of complaint (doc. no. 9), and motion to amend the
complaint (doc. no. 10).[3]  Chambers has also filed an ex parte
motion for a mandatory injunction (doc. no. 5) and addenda
thereto (doc. nos. 16-19), along with attachments to the

---

[1]Chambers has filed a motion to amend his complaint (doc.
no. 10) to add five defendants to this action: New Hampshire
State Prison Warden Richard Gerry; New Hampshire Department of
Corrections ("NHDOC") Commissioner William Wrenn; NHDOC Medical
Director Helen Hanks, Janice Theodore, and Bernie Campbell.

[2]Chambers filed a document on August 16, 2011, entitled
"Motion to Present Documents for plaintiff's Mandatory
Injunction" (doc. no. 15).  After careful review of the filing,
it appears to be an addendum to the complaint, and has been
construed and docketed as such by the court.

[3]The court construes both the addendum to, and memorandum in
support of the complaint (doc. nos. 8, 9 and 15) as part of the
complaint in this matter for all purposes.  If the District
Judge accepts this court's recommendation to grant the motion to
amend, the allegations therein will likewise be construed as
part of the complaint.

addenda.  Judge Barbadoro has referred the motion for a

mandatory injunction to this magistrate judge for a

recommendation.

The complaint, filed pursuant to 42 U.S.C. § 1983, asserts

claims relating to the discontinuation of Chambers' prescribed

pain medication.  Because Chambers is a prisoner proceeding pro

se and in forma pauperis, the matter is before me for

preliminary review to determine, among other things, whether the

complaint states any claim upon which relief might be granted.

See 28 U.S.C. § 1915A; Rule 4.3(d)(2) of the Local Rules of the

United States District Court for the District of New Hampshire

("LR") 4.3(d)(2).  For the reasons explained below, the court

recommends: (1) the motion to amend the complaint (doc. no. 10)

be granted; (2) the complaint (doc. nos. 1, 8-10 and 15) be

dismissed; and (3) the motion for a mandatory injunction (doc.

no. 5) be denied.

### Standard of Review

Under LR 4.3(d)(2), when an incarcerated plaintiff or

petitioner commences an action pro se, the magistrate judge

conducts a preliminary review.  The magistrate judge may issue a

report and recommendation after the initial review, recommending

that claims be dismissed if the court lacks subject matter

jurisdiction, the defendant is immune from the relief sought,

the complaint fails to state a claim upon which relief may be granted, the allegation of poverty is untrue, or the action is frivolous or malicious.  See id. (citing 28 U.S.C. § 1915A & Fed. R. Civ. P. 12(b)(1)).  In conducting a preliminary review, the magistrate judge construes pro se pleadings liberally, to avoid inappropriately stringent rules and unnecessary dismissals.  See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam) (following Estelle v. Gamble, 429 U.S. 97, 106 (1976), to construe pleadings liberally in favor of pro se party); Castro v. United States, 540 U.S. 375, 381 (2003).

To determine if the complaint states any claim upon which relief could be granted, the court applies a standard analogous to that used in reviewing a motion to dismiss filed under Fed. R. Civ. P. 12(b)(6).  The court decides whether the complaint contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  See Ashcroft v. Iqbal, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009).

To make this determination, the court employs a two-pronged approach.  See Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011).  The court first screens the complaint for statements that "merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action."  Id. (citations, internal quotation marks and alterations

omitted).  A claim consisting of little more than "allegations that merely parrot the elements of the cause of action" may be dismissed.  Id.  The second part of the test requires the court to credit as true all non-conclusory factual allegations and the reasonable inferences drawn from those allegations, and then to determine if the claim is plausible.  Id.  The plausibility requirement "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of illegal conduct.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007).  The "make-or-break standard" is that those allegations and inferences, taken as true, "must state a plausible, not a merely conceivable, case for relief."  Sepúlveda-Villarini v. Dep't of Educ., 628 F.3d 25, 29 (1st Cir. 2010); see Twombly, 550 U.S. at 555-56 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." (citations and footnote omitted)).

Evaluating the plausibility of a claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Iqbal, 129 S. Ct. at 1950 (citation omitted).  In doing so, the court may not disregard properly pleaded factual allegations or "attempt to forecast a plaintiff's likelihood of success on the merits."

4

Ocasio-Hernández, 640 F.3d at 13.  "The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint."  Id.

## Background

Chambers is an inmate at the New Hampshire State Prison at Concord ("NHSP").  Chambers has chronic pain in his lower back.  Although he has had two successful spine surgeries, his current condition cannot be addressed surgically.  Chambers asserts that he will have chronic lower back pain for the rest of his life that will need to be treated with pain medication.

In December 2005, Chambers was prescribed morphine while incarcerated at the Northern New Hampshire Correctional Facility.  In 2006 or 2007, Dr. John Eppolito, a physician treating New Hampshire Department of Corrections ("NHDOC") inmates, attempted to remove Chambers from his morphine prescription.  In response, Chambers filed a complaint against Dr. Eppolito with the state Board of Medicine.  Chambers was subsequently transferred to the NHSP where prison nurse practitioner Brett Mooney prescribed him morphine.

In 2009, Dr. Eppolito treated Chambers at the NHSP where, in conjunction with the Dartmouth Hitchcock Medical Center ("DHMC"), Dr. Eppolito directs a Pain Management Clinic ("PMC").

Chambers asserts that when Dr. Eppolito started the PMC, he attempted to discontinue all inmates' morphine prescriptions prior to having those inmates examined by a pain specialist. Chambers, however, saw a spine specialist at DHMC who recommended that Chambers remain on the morphine dose he was taking.

Chambers has attached copies of certain of his medical records to his complaint. Those records reveal that Chambers had an MRI[4] on November 11, 2009. Chambers was seen at the DHMC on March 26, 2010. The spine specialist there recommended that Chambers have a median branch block, which is an injection intended to provide pain relief and physical therapy for core strengthening. The DHMC doctor further recommended that Chambers' pain medication not be changed. On June 21, 2010, Chambers was seen at the DHMC Spine Center for the median branch block. The procedure was not successful, and Chambers alleges he was never provided with physical therapy.

The PMC treatment team initially followed the DHMC doctor's recommendation not to change Chambers' morphine prescription. Chambers states that the dose of morphine he has been taking, which has not changed since 2009, at some point became inadequate to treat his pain. Dr. Eppolito prescribed morphine

---

[4]"MRI" is a common acronym for "Magnetic Resonance Imaging," a diagnostic imaging test.

for Chambers pursuant to an agreement Chambers entered into with the PMC treatment team, which included a provision that Chambers would be removed from that medication if he had a "dirty urine" or "cheeked" his medication.[5]

Patients under the care of the PMC are seen monthly by the PMC treatment team.  Chambers complained about the failure of his morphine dosage to meet his pain management needs, and requested an increase in his morphine during each his monthly appointments with the PMC team, which were held on March 15, April 19, May 17, and June 9, 2011.  Dr. Eppolito declined to increase Chambers' medication.  According to medical records Chambers has filed in this case, Dr. Eppolito was uncomfortable increasing the morphine dosage if the drug was not effective at its current dose.  On June 9, 2011, Dr. Eppolito wrote in Chambers' records that he was going to wean Chambers off of morphine and substitute another pain medication.  Dr. Eppolito's note on that date states: "I do not feel safe or comfortable increasing [morphine] if this medication is not helping."

On June 14, 2011, Chambers requested an appointment either with the PMC team or at DHMC to review the results of an MRI he

---

[5]While no definitions of the terms "dirty urine" or "cheeking" have been included in the pleadings filed by plaintiff, the court is aware that a "dirty urine" is a urinalysis that is positive for illicit drugs, and "cheeking" medication is the act of hiding one's medication in one's mouth rather than taking it.

had on June 7, 2011.  Chambers hoped the results would help to persuade Dr. Eppolito to raise his morphine dose.  Chambers was scheduled to see the PMC team on June 23, 2011.

On June 23, 2011, Dr. Eppolito requested a consultation with the DHMC Spine Center.  That office responded to the request, stating that as an evaluation and unsuccessful median branch block had been done the previous year, and that there was no appreciable difference between the 2010 and 2011 MRI results, there was no need for the DHMC doctor to see Chambers at that time.  On June 26, 2011, Chambers' morphine prescription was renewed by Dr. Eppolito.

At some time prior to July 18, 2011, the date Chambers penned his initial complaint, Dr. Eppolito decided to wean Chambers off of morphine and start him on Tramadol, a pain medication, and ibuprofen, an anti-inflammatory medication. Chambers asserts that, by discontinuing his morphine, Dr. Eppolito is retaliating against him for filing a complaint with the Board of Medicine.  On July 19, 2011, at 9:00 a.m., NHSP Corrections Officer Havlock, who worked on Chambers' unit, called the NHSP Health Services Center ("HSC"), where Chambers goes to receive his pain medication.  Havlock spoke to HSC Nurse Dalia, and told her that he had recently caught Chambers "cheeking" his medication, and that Chambers had been selling

8

morphine on the housing unit.  Nurse Dalia recorded the report
from Havlock in Chambers' medical records.  Chambers sent an
Inmate Request Form ("IRS") to Havlock asking him if he had made
the report to Nurse Dalia.  Havlock's response to the IRS was:
"I told the nurse to kept [sic] an eye on Chambers."  Chambers
characterizes this statement as a denial by Havlock that he said
Chambers was cheeking and selling his medication.

    Later on July 19, 2011, Chambers had a meeting with the PMC
treatment team, including Dr. Eppolito, Nurse Janice Theodore
and Physical Therapist Bernie Campbell.  Chambers' medical
records, attached to his pleadings here, contain a July 19,
2011, entry written by Dr. Eppolito regarding that day's PMC
meeting and his intentions regarding Chambers' treatment.  Dr.
Eppolito's July 19, 2011, entry in Chambers' medical records[6]
reads as follows:

> PT seen and medication decreased – PT has been seen
> multiple times with complaints of persistent pain and
> MS Contin dose is not holding him.  PT has had several

---

[6]Dr. Eppolito's note contains several abbreviations as
follows:

- "PT" is the common medical abbreviation for "patient";
- "MS Contin" is the particular form of morphine that was
  prescribed to Chambers;
- "benzo" appears to refer, based upon the other records
  and documents filed with Chambers' pleadings, to the drug
  "Valium"; and
- "AMT" appears to refer, from its context, to a particular
  urine test.

episodes of not being able to urinate when asked.  I
myself went with PT during AMT.  PT was unable to
urinate.  PT was seen in follow-up.  PT was very happy
to give a urine.  PT voided and was positive for
benzo's [sic].  PT was very surprised.  PT very
nervous.  PT wrote an Inmate Request Slip that I
needed to do a chain of custody.  PT informed that
medical does not do chain of custody.  PT has gone
from CCU to the blocks.  Officer Havlock today
mentioned all kinds of positive urine drug screens now
that the PT is on the blocks.  I have decided to
change Mr. Chambers [sic] meds due to the 3 following
reasons:

(1) PT's MS Contin has not been controlling Mr.
Chambers pain for the last several months.  I have
made attempt to have Mr. Chambers seen by pain clinic
at DHMC, they did not think they could help him.

(2) Mr. Chambers has had several occasions where he
has not been able to produce a urine.  I have waited
with PT myself.  I have concerns that PT may know that
he does not have MS Contin in his system and
refuses/or will not urinate.  On one occasion PT
wanted to give a sample and was very surprised to find
benzo's [sic] in his urine.  PT was given valium prior
to a procedure.  I called pharmacy and they informed
me that this should have been long gone from his
system.  I did not take PT's meds away at that time
but I was beginning to become very uncomfortable and
feeling unsafe in continuing his MS Contin.  PT then
sent me an Inmate Request Slip stating that I did not
use a chain of custody.

(3) I have several concerns that Mr. Chambers is not
benefiting from this medication by his report.  There
is a report of new high incidence of dirty urine
(positive urine drug screens for morphine) in a
housing unit that he moved to.  All of these concerns
leave me uncomfortable and feeling unsafe in
continuing Mr. Chambers [sic] MS Contin.  His
medication (MS Contin) will be tapered to off. . . .
This plan was discussed with PT.  (PT's MRI reviewed

again – I do not feel diagnostic radiological imaging supports continued MS Contin).[7]

On August 6, 2011, Chambers sent IRS forms to Nurse Dalia, Dr. Eppolito, Theodore, and Campbell. In each request, Chambers asked: (1) whether CO Havlock had reported that he was cheeking his morphine; (2) whether Dr. Eppolito was made aware of the cheeking report; and (3) whether the alleged cheeking incident was the reason he was removed from morphine. Theodore and Campbell each responded on August 8, 2011. Their responses appear to confirm that the PMC treatment team had been made aware of the cheeking incident. Theodore wrote: "The decision to change your medication was discussed prior to [the cheeking report] due to your requests for an increase. Pain clinics frequently will change meds if ineffective." Campbell wrote: "No [the cheeking report] was not the reason. If medication becomes ineffective it is frequently changed."

Chambers denies ever cheeking his medication or taking substances that would produce a dirty urine while he was under the care of the PMC. Chambers concedes that on a number of occasions he was unable to produce a urine sample upon request.

---

[7]Documents filed with the complaint confirm an incident report for failing to produce a urine sample on April 4, 2011, and a disciplinary report and sanction for failing to produce a urine sample on May 13, 2011. On June 15, 2011, Dr. Eppolito, in response to Chambers's request, gave Chambers a medical pass allowing him to have extra time to produce a urine sample than what NHSP policy ordinarily allows.

He states that his medication causes his urination to be inhibited, and that he has not willfully refused to comply with a request for a urine test.

Chambers states that his June 23, 2011, urine test was positive for valium because he was given valium on June 7, 2011, in preparation for his MRI.  Chambers has filed, in his pleadings, an IRS he sent to the prison pharmacy in which he inquired as to the amount of time valium stays in a person's system.  The pharmacy responded that it would be "extremely unlikely" or "improbable" that valium could be detected in a person's system after sixteen days, even with extremely sensitive equipment.

### The Claims

Chambers filed this action raising the following claims for relief[8]:

1.   Chambers' Eighth Amendment right to adequate medical care for his serious medical needs was violated by Dr. Eppolito discontinuing his morphine prescription, in contravention of a previous recommendation from the DHMC spine specialist, and in

---

[8]The claims, as identified herein, will be considered to be the claims raised by Chambers in his complaint for all purposes. If Chambers disagrees with the claims, as identified, he must do so either by properly objecting to this Report and Recommendation or moving to amend the complaint.

response to a false report that Chambers was cheeking his medication.

2.   The medical care provided to Chambers by defendants constitutes malpractice under state law.

3.   Chambers' First Amendment right to petition the government for a redress of grievances was violated by Nurse Dalia falsely reporting that she was told that Chambers was cheeking his medication, in order to retaliate against Chambers for filing a complaint against her with the New Hampshire Board of Nursing.

4.   Chambers' First Amendment right to petition the government for a redress of grievances was violated by Dr. Eppolito discontinuing his morphine prescription in order to retaliate against Chambers for filing a complaint against him with the state Board of Medicine.

## Discussion

I.   Section 1983

Section 1983 creates a cause of action against those who, acting under color of state law, violate federal constitutional or statutory law.   See 42 U.S.C. § 1983; City of Okla. City v. Tuttle, 471 U.S. 808, 829 (1985); Wilson v. Town of Mendon, 294 F.3d 1, 6 (1st Cir. 2002).   42 U.S.C. § 1983 provides that:

> Every person who under color of any statute,
> ordinance, regulation, custom, or usage, of any State
> or Territory or the District of Columbia, subjects, or
> causes to be subjected, any citizen of the United
> States or other person within the jurisdiction thereof
> to the deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws, shall
> be liable to the party injured in an action at law
> . . ..

In order for a defendant to be held liable under § 1983, his or her conduct must have caused the alleged constitutional or statutory deprivation.  See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 692 (1978); Soto v. Flores, 103 F.3d 1056, 1061-62 (1st Cir. 1997).  Here, Chambers claims that defendants, medical care providers employed by or contracting with the state to provide him medical care during his incarceration, are state actors, and that they have violated Chambers' rights under the First and Eighth Amendments to the United States Constitution. As such, Chambers' claims arise under § 1983.

## II.  Inadequate Medical Care

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  Helling v. McKinney, 509 U.S. 25, 31 (1993); Giroux v. Somerset Cnty., 178 F.3d 28, 31 (1st Cir. 1999).  "The failure of correctional officials to provide inmates with adequate medical care may offend the Eighth

14

Amendment if their 'acts or omissions [are] sufficiently harmful to evidence deliberate indifference to serious medical needs.'" Leavitt v Corr. Med. Servs., Inc., ___ F.3d ___, ___, 2011 WL 2557009, *8 (1st Cir. June 29, 2011).  The Supreme Court has adopted a two-part test for reviewing medical care claims under the Eighth Amendment.  See Farmer v. Brennan, 511 U.S. 825, 834 (1994).  A court must first determine if the prisoner has alleged facts sufficient to show that he has not been provided with adequate care for a "serious medical need."  A serious medical need is one that involves a substantial risk of serious harm to the prisoner if it is not adequately treated.  See Barrett v. Coplan, 292 F. Supp. 2d 281, 285 (D.N.H. 2003); see also Gaudreault v. Mun'y of Salem, 923 F.2d 203, 208 (1st Cir. 1990) (defining serious medical need as one "that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention").

Second, the court must determine if the complaint contains sufficient allegations to show deliberate indifference.  Id.  To be found deliberately indifferent to an inmate's serious medical need, a prison official must both be actually aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must also actually draw

15

the inference.  See Farmer, 511 U.S. at 837.  Deliberate

indifference "may be shown by the denial of needed care as

punishment and by decisions about medical care made recklessly

with 'actual knowledge of impending harm, easily preventable.'"

Ruiz-Rosa v. Rullan, 485 F.3d 150, 156 (1st Cir. 2007) (citation

omitted).  The First Circuit has recently held that:

> The Eighth Amendment standard is in part one of
> subjective intent.  The phrasing [of the standard]
> itself implies at least a callous attitude, but
> subjective intent is often inferred from behavior and
> even in the Eighth Amendment context . . . a
> deliberate intent to harm is not required.  Rather, it
> is enough for the prisoner to show a wanton disregard
> sufficiently evidenced by denial, delay, or
> interference with prescribed health care.

Battista v. Clarke, ___ F.3d ___, 2011 WL 1902165, *3 (1st Cir.

May 20, 2011) (internal quotation marks and citations omitted);

see also Watson v. Caton, 984 F.2d 537, 540 (1st Cir. 1993)

(deliberate indifference may be found in "wanton" decisions to

deny or delay care, where the action is reckless, "not in the

tort law sense but in the appreciably stricter criminal-law

sense, requiring actual knowledge of impending harm, easily

preventable").

"'Inadvertent failures to provide medical care, even if

negligent, do not sink to the level of deliberate

indifference.'"  Braga v. Hodgson, 605 F.3d 58, 61 (1st Cir.

2010) (quoting DesRosiers v. Moran, 949 F.2d 15, 19 (1st Cir.

16

1991)); see Leavitt, 2011 WL 2557009 at *9 ("[C]arelessness or inadvertence falls short of the Eighth Amendment standard of deliberate indifference.").  To state a claim of deliberate indifference to medical needs, an inmate must allege more than that he disagrees with the course of treatment, that better treatment is available, or that there exists a difference of opinion among medical professionals regarding his diagnosis and treatment.  See Leavitt, 2011 WL 2557009 at *9; Ruiz-Rosa, 485 F.3d at 156; Feeney v. Corr. Med. Servs., 464 F.3d 158, 162 (1st Cir. 2006) ("When a plaintiff's allegations simply reflect a disagreement on the appropriate course of treatment, such a dispute with an exercise of professional judgment may present a colorable claim of negligence, but it falls short of alleging a constitutional violation." (internal citations omitted)); see also United States v. DeCologero, 821 F.2d 39, 42 (1st Cir. 1987) ("And though it is plain that an inmate deserves adequate medical care, he cannot insist that his institutional host provide him with the most sophisticated care that money can buy.") (emphasis in original).

    A.   Serious Medical Need

Chambers has alleged facts showing that he suffers chronic, severe back pain, resulting from long-standing back problems, that will last for the rest of life.  Chambers' back problems

17

are presently not treatable surgically, and his physicians have
determined that his pain must be treated with medication.
Chambers has stated sufficient facts to assert that the problems
with his back, and the pain he suffers as a result thereof,
constitute a serious medical need.

B.   Deliberate Indifference

The critical issue here is whether the prison's decision to
discontinue Chambers' morphine prescription, and wean him off of
morphine in favor of a different medication regimen, amounts to
"deliberate indifference" to his serious medical needs, or is
"'simply . . . a disagreement on the appropriate course of
treatment.'"  Feeney, 464 F.3d at 162 (quoting Ferranti v.
Moran, 618 F.2d 888, 891 (1st Cir. 1980)).  The court, as
discussed below, concludes that Chambers does not assert an
actionable claim of deliberate indifference to his medical needs
based on the prison's decision to discontinue his morphine
prescription.

Chambers asserts that he has been treated with morphine for
a number of years at the prison.  Chambers further asserts that
in 2010, the DHMC spine specialist recommended continuing
Chambers on morphine.  Dr. Eppolito, at that time, followed the
recommendation to treat Chambers with morphine.  Eventually,
however, the morphine stopped working as well as it had in the

past, and Chambers requested a higher dosage.  Instead of increasing the morphine, Dr. Eppolito opted to remove the morphine in favor of other drugs, Tramadol and ibuprofen.

Chambers does not assert that Dr. Eppolito prescribed the new drugs believing they would be inadequate to treat his pain, or that Dr. Eppolito had any intention of making him suffer by altering his prescriptions.  Further, the record before the court reflects that Chambers was provided, in addition to prescription medication, diagnostic MRI testing, monthly appointments with a pain management treatment team, a "TENS" Unit (a small device designed to provide local pain relief through the external application of a small electrical charge), a number of consultations with the DHMC spine specialist, and a median branch block injection.  There is no indication in the documents before the court, with the exception of Chambers' own conclusory statements, that any medical professional at the prison ever failed or declined to treat Chambers' pain, or ever expressed or implied any intention to cause Chambers to suffer harm or pain.  In short, Chambers has not stated sufficient facts to allege deliberate indifference to his serious medical needs.

To the extent Chambers claims that Dr. Eppolito, Theodore, Campbell, Nurse Dalia or any other medical care provider at the

NHSP acted with deliberate indifference to his serious medical needs by relying on a false cheeking report, without properly investigating its veracity, his argument is equally unavailing. Both Theodore and Campbell advised Chambers the PMC treatment team had decided to discontinue his morphine prior to learning of the alleged cheeking.  Also, the court notes that Chambers' own filing belies his argument.  Chambers' initial complaint in this matter, alleging that Dr. Eppolito was acting unconstitutionally in discontinuing Chambers' morphine prescription, was dated July 18, 2011, the day before the cheeking was reported to the PMC treatment team.  The record before the court demonstrates that the decision to change Chambers' medication was made prior the cheeking report and, as already addressed above, that decision does not evince deliberate indifference and thus does not give rise to any claim under the Eighth Amendment.

Chambers' complaint reveals no more than his disagreement, and, liberally construed, the potential disagreement of the DHMC spine specialist, with Dr. Eppolito's choice of medication for Chambers' pain.  No constitutional claim arises out of such a disagreement absent a showing that the prescribing doctor was deliberately indifferent to Chambers' medication needs – a

showing that has not been made here.  The court therefore recommends dismissal of Chambers' Eighth Amendment claim.

        C.   State Law Claims Re: Medical Care

        Where, as here, there is no diversity of the parties, this court can obtain jurisdiction over plaintiffs' state law claims only by exercising its supplemental or pendant jurisdiction where the claim is part of the same case or controversy as a federal claim properly before this court.  See 28 U.S.C. § 1367(a) (allowing court to exercise supplemental jurisdiction over state law claims that are "so related to the claims in the action within the original jurisdiction that they form part of the same case or controversy"); see also United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966).  Because the court finds that Chambers has failed to state a violation of any federal right arising out of the medical care he has received at the NHSP, and recommends dismissal of that claim, the court should decline to exercise jurisdiction over the state law claims which arise out of Chambers' complaints regarding his medical care.  Those claims should be dismissed from this action without prejudice to renewal in a state court action.

III. <u>Retaliation Claims</u>

Chambers alleges that: (1) Dr. Eppolito is discontinuing his morphine prescription in retaliation for a complaint Chambers filed with the Board of Medicine, and (2) Nurse Dalia made a false entry in Chambers' medical records stating that Chambers was cheeking his medication in retaliation for a complaint Chambers filed against her with the Board of Nursing. The First Amendment shields prisoners from retaliation in response to their engaging in protected speech. <u>Ortiz v. Jordan</u>, ___ U.S. ___, ___, 131 S. Ct. 884, 893 (2011) (citing <u>Crawford-El v. Britton</u>, 523 U.S. 574, 592 (1998)). "[G]overnment actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." <u>Mitchell v. Horn</u>, 318 F.3d 523, 530 (3d Cir. 2003); <u>see also</u> <u>Ferranti</u>, 618 F.2d at 892 n.4 ("actions otherwise supportable lose their legitimacy if designed to punish or deter an exercise of constitutional freedoms").

In order to state a claim for retaliation for exercising his First Amendment rights, Chambers must allege: (1) the conduct which led to the alleged retaliation was protected by the First Amendment; (2) some adverse action at the hands of the

prison officials; and (3) a causal link between the exercise of his First Amendment rights and the adverse action taken.  See Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011).  The court considers each element of Chambers' claim in turn.

A.    Protected Conduct

The right to petition the government for a redress of grievances has been characterized as "among the most precious of the liberties safeguarded by the Bill of Rights."  United Mine Workers v. Ill. State Bar Ass'n, 389 U.S. 217, 222 (1967).  In the prison context, this right means that inmates must be "permit[ted] free and uninhibited access . . . to both administrative and judicial forums for the purpose of seeking redress of grievances against state officers."  Turner v. Safley, 482 U.S. 78, 84 (1987) (citing Johnson v. Avery, 393 U.S. 483 (1969)).  The First Amendment's protection of the right to petition the government for a redress of grievances includes protection for filing a complaint with a state board of medicine.  See Franco v. Kelly, 854 F.2d 584, 589-90 (2d Cir. 1988) (right to petition "applies with equal force to a person's right to seek redress from all branches of government," and prisoner "should not be any less entitled to relief under section 1983 because he was addressing his complaints to a state administrative agency rather than to a court of law"); Sayre v.

23

McBride, Nos. 5:07-cv-00282 and 5:07-cv-402, 2008 WL 373681, *3
(S.D. W. Va. Feb. 12, 2008) (recognizing inmate had First
Amendment protection for complaint filed with West Virginia
Board of Medicine).

Chambers has alleged that he exercised his First Amendment
right to petition the government for a redress of grievances by
filing complaints against Dr. Eppolito and Nurse Dalia with the
New Hampshire Board of Medicine and Board of Nursing.  Because
Chambers' right to file an administrative complaint with a state
agency is protected by the First Amendment as an exercise of his
right to petition the government to redress grievances, Chambers
has alleged sufficient facts to satisfy the first requirement of
his retaliation claims.

    B.   Adverse Action

To state an adverse action, plaintiff must allege he was
subjected to "conduct that would deter a similarly situated
individual of ordinary firmness from exercising his or her
Constitutional rights."  Dawes v. Walker, 239 F.3d 489, 492 (2d
Cir. 2001), overruled in part on other grounds by Phelps v.
Kapnolas, 308 F.3d 180, 187 n.6 (2d Cir. 2002).  An adverse act
must be more than "de minimis" to be considered capable of
deterring an inmate of ordinary firmness.  See Starr v. Dube,
334 Fed. App'x 341, 342 (1st Cir. 2009).  Even if a particular

inmate is not chilled in his expression, a claim for retaliation
may still arise if the retaliatory behavior alleged is
objectively sufficient and onerous to deter an ordinary person
from exercising his rights.  Gay v. Shannon, No. Civ.A. 02-4693,
2005 WL 756731, *8 (E.D.Pa. Mar. 1, 2005) (citing Allah v.
Seiverling, 229 F.3d 220, 225 (3d Cir. 2000)).

        i.   Dr. Eppolito

Chambers does not allege here that Dr. Eppolito denied him
all pain medication in order to make him suffer.  Chambers
alleges that Eppolito switched him from morphine, his medication
of choice, to a different prescription pain medication.
Chambers states that his daily life "is hell" without morphine,
but he has not alleged that, after the morphine was removed, he
was denied pain medication or any other treatment for his pain.
While Chambers would prefer not to be removed from morphine, he
does not have a right to the medication of his choice.  See
Feeney, 464 F.3d at 162.

Where, as here, Chambers was switched from one medication
to another when the physician determined that the first
medication had lost its efficacy, the court finds that such a
change in medication, without more, would not deter a person of
ordinary firmness from filing a complaint against a medical
professional.  Accordingly, the court finds that Chambers has

failed to state an adverse act by Dr. Eppolito sufficient to
satisfy the second prong of a retaliation claim.

### ii.  Nurse Dalia

By agreement with the PMC, Chambers' receipt of morphine
for his pain was conditioned on Chambers' abstinence from
inappropriate behavior with that medication, including cheeking.
Given that agreement, and the prison context in general, it is
reasonable for the court to assume that Nurse Dalia, at the time
she wrote the allegedly false cheeking entry in Chambers'
medical records, was aware that the entry could negatively
impact Chambers' ability to continue to receive morphine to
treat his pain.  As Chambers needs pain medication, Nurse
Dalia's action in writing the allegedly false entry was
sufficiently adverse to satisfy the second element of a
retaliation claim against her.

### C.   Causation

Chambers' retaliation claims against both Dr. Eppolito and
Nurse Dalia fail on the third prong of the analysis, as Chambers
does not allege a sufficient causal nexus between the protected
conduct and the adverse action.  Chambers has failed to allege
facts to indicate that there is any connection, much less
causation, between Dr. Eppolito's or Nurse Dalia's allegedly

adverse acts and Chambers' complaints against them with the
Board of Medicine and Board of Nursing.  Circumstantial evidence
may be enough to support a claim that an adverse action was
taken with retaliatory intent, as intentions are often difficult
to prove through direct evidence.  See Hannon, 645 F.3d at 94;
Beauchamp v. Murphy, 37 F.3d 700, 711 (1st Cir. 1994); Ferranti,
618 F.2d at 892 (chronology of events provided support for
inference of retaliation); McDonald v. Hall, 610 F.2d 16, 18
(1st Cir. 1979) (same); see also Woods v. Smith, 60 F.3d 1161,
1166 (5th Cir. 1995).

     With respect to Dr. Eppolito, Chambers has alleged only
that he filed a complaint against Dr. Eppolito in the past
(2006-2007), and that, in retaliation, Dr. Eppolito has recently
decided to substitute Chambers' current dose of morphine for an
alternative pain medication rather than raise his morphine dose.
That allegation fails to invoke even the slightest implication
that Dr. Eppolito's decision to change Chambers' medication was
a form of retaliation for Chambers' prior complaint.

     Regarding Nurse Dalia, Chambers alleges she intentionally
set out to harm him with a false cheeking report.  No specific
allegation in the complaint, aside from his bald assertion,
connects that act to Chambers' prior complaint to the Board of
Nursing.

Because Chambers has failed to state sufficient facts to demonstrate that the change in his medication was caused by Dr. Eppolito's or Nurse Dalia's efforts to retaliate against him for his previous complaints, he has failed to state retaliation claims against either Dr. Eppolito or Nurse Dalia.

IV.   Motion to Amend (doc. no. 10)

Chambers seeks to amend his complaint to add five defendants to the action: NHSP Warden Richard Gerry, New Hampshire Department of Corrections ("NHDOC") Commissioner William Wrenn, NHDOC Medical Director Helen Hanks, Bernie Campbell, and Janice Theodore.  Chambers asserts that as members of the PMC who were aware of or participated in removing Chambers' morphine prescription, they are proper defendants to this action.

Fed. R. Civ. P. 15(a)(1) allows Chambers to amend his pleading once as a matter of course within 21 days of the service of a response to the complaint.  As this matter has not been served, the motion to amend (doc. no. 10) should be granted.

V.   <u>Motion for Mandatory Injunction</u>

Chambers seeks an injunction directing that the DHMC, and not the NHDOC medical department, be placed in charge of Chambers' primary medical care while he is at the NHSP.  Because the court recommends that the complaint be dismissed for failing to state any claim upon which relief might be granted in this court, the court further recommends that the motion for mandatory injunction (doc. no. 5) be denied.

## Conclusion

For the foregoing reasons, the court recommends that: (1) the motion to amend (doc. no. 10) be granted; (2) the complaint (doc. nos. 1, 8-10 and 15) be dismissed in its entirety; and (3) the motion for mandatory injunction (doc. no. 5 and 16-19) be denied.  The dismissal of this action should be without prejudice to Chambers raising his state law claims in a state court of competent jurisdiction.

Any objections to this Report and Recommendation must be filed within fourteen days of receipt of this notice.  <u>See</u> Fed. R. Civ. P. 72(b)(2).  Failure to file objections within the specified time waives the right to appeal the district court's order.  <u>See</u> <u>Sch. Union No. 37 v. United Nat'l Ins. Co.</u>, 617 F.3d

554, 564 (1st Cir. 2010); <u>United States v. Lugo Guerrero</u>, 524
F.3d 5, 14 (1st Cir. 2008).

_____
Landya B. McCafferty
United States Magistrate Judge


Date:  August 24, 2011

cc:  Randolph Chambers, pro se

LBM:jba